1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| LINDA JONES, | ) 1:06-cv-01585 LJO GSA |
| | ) |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION |
| | ) REGARDING PLAINTIFF'S |
| v. | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) (Docs. 27 and 32) |
| of Social Security, | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

9
10
11
12
13
14
15
16

17

## BACKGROUND

18
19
20
21
22
23

Plaintiff Linda Jones ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge, for findings and recommendation to the District Court.

24

## FACTS AND PRIOR PROCEEDINGS[1]

25
26

On August 20, 2004, Plaintiff filed an application for disability insurance benefits.  AR 48.  She alleged disability due to arthritis.  AR 65.  After being denied both initially and upon

27
28

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 21-26, 28-32, 35.  On May 22, 2006, ALJ Peter J. Valentino held a hearing.  AR 169-209.  ALJ Valentino denied benefits on June 20, 2006.  AR 9-18.  On August 31, 2006, the Appeals Council denied review.  AR 4-7.

Hearing Testimony

On May 22, 2006, ALJ Haubner held a hearing in Fresno, California.  AR 169-209.  Plaintiff appeared with her attorney, Robert Ishikawa.  AR 171.  Vocational expert ("VE") Cheryl Chandler also appeared and testified.  AR 171, 197-204.

Plaintiff testified that she reported to "Dr. Watress" that she was going back to work in the year prior to the hearing.  AR 172.  When she found out she was not going to get any Social Security, she told Dr. Watress that she had to try something to bring in income because she did not have any.  AR 172.  She was going to try to go back to work.  AR 172.  She used to make $56,000 a year and going down to nothing was not her choice.  AR 172.  She found a company that she could freelance selling advertising for and work at her own pace.  AR 173.  She went to work for Fanfare Media, which consists of selling advertising that goes on the back of cash register receipts.  AR 172.  There are a lot of phone calls and setting up appointments.  AR 173.  She figured at her own pace she should be able to do that.  AR 173.  She was an independent contractor.  AR 173.  She started that job in March 2005 and stopped in June 2005.  AR 173-174.

Prior to that, Plaintiff worked at the Watsonville Newspapers until the end of 2003 when she went on disability.  AR 174.  She was an advertising executive and worked on and off for about five years.  AR 174-175.

Plaintiff testified that she was involved with Dance With Me from July through November 2005.  AR 177.

Plaintiff testified that with Fanfare Media, she had to go out two or three days a week and meet with people.  AR 177.  She would go to the businesses downtown or the shopping centers to try to sell.  AR 177.  There were "cold calls," driving, walking and making presentations.  AR 177.  She stopped Fanfare in June of 2005 because she "wasn't able to do it."  AR 178.  She would go out one day, and the next day, she would be sick.  AR 178.  Her knees stay swollen all

the time, but with walking, standing and in and out of cars they swell "even more."  AR 178.
She stopped because of her health.  AR 178.

Plaintiff testified that Fanfare Media is out of Valencia.  AR 178.  She was a "roamer"
and would go to Fresno, Tulare, Porterville and Visalia.  AR 178.  She would go wherever they
needed someone to cover a section.  AR 178.

Plaintiff started Dance With Me.  AR 179.  It is a retail business.  AR 179.  She can go to
conventions and sell dance clothes.  AR 179.  She used to be a dancer.  AR 179.  She was trying
to do something to make some money.  AR 179.  She mortgaged her house and invested about
$60,000 to start the business because she "had to do something."  AR 179.   In the business, you
have to buy clothes.  AR 179.  She hired someone to load and unload the trailer.  AR 179.  Her
brother helped and her 18-year-old granddaughter helped by going to the shows.  AR 179.  Her
granddaughter did the last couple of shows.  AR 179.  The shows are scheduled throughout
California--Fresno, Sacramento, San Francisco, or Los Angeles.  AR 179.  She would drive to
those places and set up a vendor's booth.  AR 179.  There is a lot of sitting, processing credit
cards, and hanging clothes.  AR 180.

Plaintiff testified that she probably attended eight conventions.  AR 180.  She has been
asked if she would go out of state, but she was not able to go.  AR 180.  She was not an agent
and it is not a franchise.  AR 180.  She did it on her own.  AR 180.  She would contact the
convention and ask if they needed a clothes vendor at their event.  AR 181.

Plaintiff testified that she "figured" the work selling dance products would be sitting and
selling things.  AR 181.  She would not be walking all day, presenting a program or trying to go
into different businesses.  AR 181.

Plaintiff did not sell the business.  AR 181.  She still has the "stuff" in the rental trailer.
AR 181.  She is hoping that her granddaughter will take over the business and pay her back.  AR
182.  She took a home equity line of credit.  AR 182.  Her granddaughter has not been on her
own on any of the conventions.  AR 182.  Plaintiff's mom or Plaintiff went with her to the
conventions.  AR 182.  Plaintiff's mom and granddaughter have gone to the conventions without
her.  AR 182-183.  The last time they went was in January.  AR 183.  Before that, Plaintiff

usually was with them.  AR 183.  She still has the business.  AR 183.  She does not know if she is going to schedule more.  AR 183.  Her granddaughter is doing what she can, but is going to school and has her own job.  AR 183.

Before the last two enterprises, Plaintiff worked on and off for five years as an advertising executive making approximately $56,000 a year.  AR 183-184.  She worked in Watsonville.  AR 184.  She also worked for Central Valley Publishing and Sylvanus newspapers.  AR 184.  This required traveling around each town and to smaller, different towns.  AR 184.  Plaintiff testified that she stopped in 2003 for health reasons.  AR 184.  She had rheumatoid arthritis.  AR 184.  She got two tickets and was in a fender bender because she would not take pain pills during the day.  AR 184.

Plaintiff testified that she also worked as a cosmetologist.  AR 185.  She last worked in a beauty salon in 2000.  AR 185.  She was working weekends doing hair.  AR 185.  In her opinion, she would not be able to continue with that work because her hands are one of the worst things.  AR 185.

Plaintiff testified that Dr. Watress is her attending doctor.  AR 185.  She sees him once every two months because she does not have insurance.  AR 185.

Plaintiff testified that she has been divorced for a "long, long time."  AR 185.  She lives in a house with her mother and her granddaughter.  AR 185-186.  She is five feet tall and approximately 130 pounds.  AR 186.  Her mother is in her 70s.  AR 186.

Plaintiff testified that she likes to paint.  AR 186.  She has not painted in almost a year.  AR 186.  She is able to do some gardening.  AR 186.  She tries to do "everything and anything" she can around the house.  AR 186.  It is just a matter of how long she can do it and how may pain pills to take.  AR 186.  She occasionally goes dancing.  AR 187.  They have little dances around Fresno, Visalia and Tulare.  AR 187.  She occasionally goes to some of the places.  AR 187.  It is ballroom dancing.  AR 187.

Plaintiff testified that she is never symptom-free.  AR 187.  The flare-ups are when they are worse.  AR 187.  Her hands and her knees stay swollen.  AR 187.  Her knees burn all the

time.  AR 187.   The more she does, the worse they get.  AR 187.  If the weather is cold, she is almost housebound.  AR 188.

Plaintiff testified that she has a valid driver's license.  AR 188.  She drives a SUV.  AR 188.  She could not lift 50 pounds.  AR 189.  She can bring in a bag of potatoes from the grocery store.  AR 189.  She might occasionally lift 20 pounds.  AR 189.  She does not lift 10 pounds regularly.  AR 189.  If she went to the grocery store, she would lift 10 pounds of potatoes and bring it into the house.  AR 189.

Plaintiff testified that she takes Vicodin for pain.  AR 189.  It is not a "real high dose," but will "take the edge off."  AR 189.  If she has done something all day long, she cannot take enough pain pills.  AR 189.  She can take two at a time and they will not help.  AR 189.

Plaintiff understood her doctor's opinion that she could stand two hours was not without interruption.  AR 150.   She could not sit for four hours without getting up because her ankles swell.  AR 150.

Plaintiff disagreed with her doctor's statement that examination revealed a mild tenderness in wrists, knees and ankles.  AR 192.  She does not think it is mild.  AR 192.

In response to questions from her legal counsel, Plaintiff testified that when she goes dancing, the dances are about three minutes.  AR 192.  She probably could do that for a total of 15 minutes out of two hours.  AR 192.  Her knees and hands stay swollen all the time.  She loses feeling from the swelling in the hands.  AR 192.  She has lumps in her arms from the swollen tissues.  AR 192.  She gets flare-ups 20 days out of 30.  AR 192-193.  When she gets the flare-ups, she takes more pain pills.  AR 193.

Plaintiff testified that she can do a little bit of housework and cooking.  AR 193.  When she takes the pain pills, she is "okay around the house."  AR 193.  She has bruises all over her because she runs into things.  AR 193.  She is not out driving a car or trying to work.  AR 193.  Nobody is going to hire her on pain pills.  AR 193.

Plaintiff testified that when she takes pain pills her reflexes are slower and her memory is not as good.  AR 193.  She does not overtake the pills, but waits until she has to take them.  AR 193.  If she is home doing almost nothing, she probably takes four pain pills a day.  AR 193.  If

she has done something during the day, she is in misery.  AR 193.  Her knees will "really, really swell up" and it makes her sick.  AR 193-194.  If she is not doing anything, she can get by with about four pain pills a day.  AR 194.

Plaintiff testified that she got into some accidents because she was not paying enough attention.  AR 194.  She was in pain all the time.  AR 194.  She would drop her briefcase.  AR 194.  She would stumble over things.  AR 194.  AR 194.  She fell down at clients.  AR 194.  She could not focus.  AR 194.  She told her doctor about these episodes.  AR 194.  That is why her first doctor put her on disability in the first place.  AR 194.

Plaintiff testified that she has been on state disability.  AR 194.  She was on that for a year after she stopped her job in Watsonville.  AR 195.  She was in pain and had problems concentrating.  AR 195.

Plaintiff testified that her hands and her knees hurt the most.  AR 195.  Now it is going into her back.  AR 195.  She can reach for something but she drops things.  AR 195.  She cannot reach continuously.  AR 195.  Her shoulders would bother her.  AR 195.  She has dropped glasses, bottles, pens and her purse.  AR 196.  She will just lose the grip in her hands sometimes.  AR 196.  She can pick up coins off of a table with a little difficulty.  AR 196.  She could do fingering or computer keys for a short time.  AR 196.  She can do it for a longer time if she takes pills.  AR 196.  She has been on her computer an hour at a time, but not with continual typing.  AR 196.  After an hour, she quits because her index finger and her thumb on her right hand are "kind of deformed."  AR 196.  She thought she could finger or do a keyboard 15 minutes at a time and maybe two hours, but then she would probably have to take a pain pill.  AR 196.

Plaintiff testified that some of her joints throb, like shutting a finger in a door, after they are overworked.  AR 197.  Her knees burn and "get a fever."  AR 197.  She used to dance for a hobby six nights a week.  AR 197.  She is lucky to dance five or six dances in one night.  AR 197.  If she can dance three, she feels like she has accomplished something.  AR 197.

Plaintiff testified that before she quit working she would go home at lunch and lie down.  AR 197.  When she got off work at night, she would "be like a vegetable" and "have to almost crawl out of bed."  AR 197.

1    VE Chandler also testified in response to questions from the ALJ. AR 198. The VE

2 testified that Plaintiff's primary work history was in cosmetology, which is a skilled job, light

3 work as is classified in the DOT. AR 198. The VE indicated that every now and then, they have

4 to lift something heavier than 20 pounds, but it should fit predominately in the light category.

5 AR 198. The VE also testified that Plaintiff has done advertising sales, which would be

6 classified as light and skilled work. AR 198. Plaintiff's office work would be semi-skilled and

7 sedentary. AR 198. Her dancewear company would be classified as skilled, light work. AR

8 198.

9    For the first hypothetical, the ALJ presented an individual with Plaintiff's background

10 who has rheumatoid arthritis that limits her to a sit/stand position with lifting at the light

11 exertional capacity 20 pounds occasionally and 10 pounds frequently. AR 199. This individual

12 also would be precluded from vibration, concentrated exposure to vibration, unprotected heights,

13 moving machinery and extreme changes in temperature. AR 199. The VE testified that this

14 person could not perform Plaintiff's past work. AR 199. The VE thought that some of

15 Plaintiff's clerical jobs would fit to allow some sit/stand, such as certain receptionist type work.

16 AR 199. These are semi-skilled positions with an SVP of 3 or 4. AR 199-200. The VE testified

17 that the original base in California was nearly 80,000 jobs, but would be reduced by 50 percent

18 for those that would not allow for a sit/stand option. AR 200. These are sedentary jobs. AR

19 200. There would be ten times that amount in the nation. AR 200.

20    The VE testified that there would be other positions as a customer service representative

21 with similar types of duties. AR 200. They are sedentary, semi-skilled. AR 200. Applying a

22 similar erosion, the VE testified there would be approximately 20,000 jobs. AR 200.

23    For the second hypothetical, the ALJ asked the VE to assume a hypothetical based on

24 Exhibit 7F. AR 201. The VE testified that it would allow for a sit/stand option. AR 201. The

25 VE also testified that the one thing that the doctor comments on that could make a change would

26 be the comment regarding reaching, handling, pushing and pulling. AR 201. The VE indicated

27 that those were referenced as being affected by the impairments, but not to what degree. AR 201.

28

As read by the VE, it was a sit/stand option and she had to be up and down every 15 minutes. AR 201.

In response to questions from Plaintiff's attorney, the VE testified that a person who could walk and/or stand two hours and sit fours hours would reduce the number of jobs in the national economy because full-time work is assumed to be seven or eight hours. AR 202. The VE indicated that the Department of Labor considered six of eight being full time. AR 202. From a vocational perspective, talking about six of eight hours considers breaks and lunch hours. AR 202.

The VE could not guess how much of a reduction there would be if a person could sit four hours and stand and/or walk two hours. AR 203. The VE testified that the positions are in the range of an eight-hour day. AR 203. A person is going to be paid for an eight-hour day and provided their breaks. AR 203. The VE testified that employers pay for a lunch hour or it is adjusted into their time. AR 203. If it is not paid lunch, then they work 8:00 to 5:00. AR 204. The VE did not know how much of the working population received a paid lunch period. AR 204.

Plaintiff's counsel argued that the number of jobs in the national economy would be drastically reduced if a person only could work six out of eight hours in a day. AR 204. Plaintiff's counsel assumed that most employers do not pay for a lunch hour. AR 204.

Plaintiff testified that she has never said she could not do anything. AR 206. She can "do almost anything" she puts her mind to, but she could not work six hours a day without taking pain pills. AR 206. She testified that most companies' insurance would not cover you if you were on pain pills working. AR 207. The VE testified that insurance was getting a lot tighter, but if an employer has insurance, they "usually are able to put an employee on." AR 207.

At the hearing, the ALJ observed that Plaintiff's knees and hand were swollen. AR 208.

Medical Evidence

On May 23, 2001, Plaintiff underwent x-rays of her hands and feet. AR 97. Plaintiff had bilateral mild foot soft tissue swelling with periarticular osteoporosis at PIP joints of her toes.

1   AR 97.  She had no abnormality of her left wrist or hand.  AR 97.  There was no evidence of

2   rheumatoid arthritis in her right hand.  AR 97.

3          On June 1, 2001, Thaila Ramanujam, M.D., prepared a report regarding examination of

4   Plaintiff.  AR 93-94.  Plaintiff complained of bilateral hand and wrist swelling and bilateral ankle

5   pain.  AR 93.  On examination, Plaintiff had synovial swelling of the wrists and metacarpal joints

6   bilaterally.  AR 93.  She had diminished grip strength.  AR 93.  She had diffuse swelling of her

7   toes and pitting edema on the dorsal aspect of her feet.  AR 93.  Dr. Ramanujam assessed

8   Plaintiff with bilateral wrist metacarpal and metatarsal synovitis reminiscent of early stages of

9   rheumatoid arthritis.  AR 93.  Dr. Ramanujam prescribed Prednisone and ordered X-rays of

10  Plaintiff's hands and feet.  AR 94.

11         On March 16, 2004, Plaintiff sought treatment from Dr. Ramanujam for swollen hands.

12  AR 92.  On examination, Plaintiff's shoulders were fine.  Dr. Ramanujam opined that Plaintiff's

13  rheumatoid arthritis was still active in her right wrist.  AR 92.  Plaintiff was prescribed Trexall,

14  Vicodin and Elavil.  AR 92.

15         On March 25, 2004, Plaintiff underwent a rheumatological evaluation by Daniel Watrous,

16  M.D.  AR 108-110.  Plaintiff reported developing rheumatoid arthritis in her hands about 2 to 2½

17  years prior to the evaluation with increasing pain.  AR 108. She also reported that the arthritis

18  spread to her legs, feet and shoulders.  AR 108.  She received some improvement with Remicade,

19  but continued to have some difficulty sleeping, chronic fatigue, aching and soreness in her joints

20  and morning stiffness.  AR 108.

21         On physical examination, Plaintiff's peripheral joints revealed "mild discomfort in the

22  wrists, knees, ankles, and small joints of the hands."  AR 109.  She did not have any erythema,

23  increased warmth or effusions.  AR 109.  Dr. Watrous did not find definite significant synovitis.

24  AR 109.  Examination of her periarticular tissues revealed no evidence of vasculitis, tendonitis,

25  bursitis or fibromyalgia tender points.  AR 100.  Examination of her spine revealed no significant

26  tenderness to palpation along the paraspinal muscles or the sacroiliac joints.  AR 110.  Her range

27  of motion and positioning were good.  AR 100.  Dr. Watrous assessed Plaintiff with a history of

28

rheumatoid arthritis, "stable on Remicade." AR 100. He planned to treat her with Remicade. AR 100.

On April 14, 2004, Plaintiff sought treatment from Dr. Watrous for her rheumatoid arthritis. AR 107. She reported doing "reasonably well" except for soreness and aching in her knees and wrists. AR 107. On examination, Plaintiff had mild discomfort in both knees, shoulders and wrists. AR 107. Dr. Watrous planned to increase Plaintiff's Remicade dose in May 2004. AR 107.

On May 17, 2004, Plaintiff saw Dr. Watrous for complaints of aching, soreness and discomfort. AR 105. Plaintiff reported that the Remicade seemed to wear off and her stiffness increased. AR 105. On examination, Plaintiff had mild discomfort in the wrists and "MCP's" and slightly in the knees. AR 105. Dr. Watrous prescribed an increased dose of Remicade, which she received by standard infusion protocol. AR 105, 106.

On June 17, 2004, Plaintiff saw Dr. Watrous for complaints of inflammation of her knees. AR 104. On examination, Plaintiff had "a very mild popliteal cyst bilaterally with some tenderness to bilateral calves and ankles with some mild swelling." AR 104. She had good range of motion and her upper extremities moved well. AR 104. Dr. Watrous assessed Plaintiff with rheumatoid arthritis, stable, with recent effusion to knees and severe allergies. AR 104. He prescribed methotrexate and continued Remicade IV every eight weeks. AR 104.

On July 15, 2004, Plaintiff saw Dr. Watrous. AR 102. Plaintiff reported that Remicade did not seem to help. AR 102. She had pain in the hands, wrists and feet. AR 102. On examination, Plaintiff had mild tenderness in her joints. AR 102. Dr. Watrous prescribed an increased dose of Remicade, which Plaintiff received by standard infusion protocol. AR 102, 103.

On August 6, 2004, Dr. Watrous prepared a supplementary certificate for the state Employment Development Department. AR 101. Dr. Watrous opined that Plaintiff's arthritis continued to make Plaintiff disabled. AR 101. Dr. Watrous opined that Plaintiff's chronic joint pains prevented her from returning to regular and customary work. AR 101. She had a poor

1  response to therapy.  AR 101.  Dr. Watrous estimated that Plaintiff would be able to perform her

2  regular and customary work on February 1, 2005.  AR 101.

3       On August 6, 2004, Plaintiff underwent an MRI of her right second and third

4  metacarpophalangeal joints.  AR 113, 114.  The MRI revealed small erosions measuring roughly

5  2 mm in the proximal aspects of the triquetrum and dorsally within the lunate.  AR 113.  She also

6  had small erosions at the volar aspect of the capitate proximally.  AR 113.  Cortical irregularity

7  was demonstrated distally within the lunate and at the ulnar aspect of the capitate.  AR 113.  She

8  had diffuse cortical irregularity throughout the carpal bones and erosions at the radial and ulnar

9  aspects of the distal capitate and the distal hamate.  AR 114.

10      On September 9, 2004, Plaintiff sought treatment from Dr. Watrous for rheumatoid

11  arthritis.  AR 99.  Plaintiff complained of increasing pain, aching, soreness and prolonged

12  stiffness.  AR 99.  She reported a pain level up to 8.  AR 99.  On examination, she had "mild

13  tenderness in the wrists, knees and MCPs."  AR 99.  Dr. Watrous increased Plaintiff's dose of

14  Remicade, which she received by standard infusion protocol.  AR 99, 100.

15      On November 4, 2004, Plaintiff saw Dr. Watrous for her rheumatoid arthritis.  AR 137.

16  She did not feel that the Remicade helped very much and reported not having much energy.  AR

17  137.  On examination, Plaintiff had mild discomfort in the wrists and the knees.  AR 137.  She

18  received Remicade by standard infusion protocol.  AR 137.  Dr. Watrous refilled her prescription

19  for Mobic and Vicodin.  AR 137.

20      On November 20, 2004, Sarupinder Bhangoo, M.D., a board certified internal medicine

21  physician, completed a comprehensive internal medicine evaluation of Plaintiff.  AR 122-126.

22  Plaintiff complained of joint pains in her hands, knees and lower back due to rheumatoid

23  arthritis.  AR 122.  Plaintiff rated her morning pain at 10/10 occasionally and 3/10 on good days.

24  AR 122.  She also reported stiffness for many hours in the mornings.  AR 122.  Plaintiff

25  indicated that she developed pain in the knees and back, which she rated from a 1 to an 8 on a

26  scale of 1 to10.

27

28

With regard to her activities of daily living, Plaintiff reported that she was able to do her personal care, help her mother with the household chores and garden.  AR 122.  She painted regularly and occasionally went dancing.  AR 123.

On physical examination, Plaintiff used her hands and upper extremities in a normal fashion.  AR 123.  She had no evidence of redness, tenderness, synovial hypertrophy or joint deformities usually associated with rheumatoid arthritis in her hands.  AR 124.  Her motor strength was 5/5 in all extremities and her hand grip was normal.  AR 125.

Dr. Bhangoo diagnosed Plaintiff with rheumatoid arthritis by history.  AR 125.  Dr. Bhangoo opined that Plaintiff had a definite history of rheumatoid arthritis as she was taking Remicade and methotrexate, but she did not have any evidence of active rheumatoid arthritis.  AR 125.  She did not have synovial hypertrophy, joint deformities, localized tenderness or redness, suggestive that her rheumatoid arthritis was in remission.  AR 125.  Dr. Bhangoo opined that Plaintiff should be able to stand and/or walk for eight hours during an eight-hour workday and sit for eight hours during an eight-hour workday.  AR 125.  She did not need an assistive device.  AR 125.  She could lift 100 pounds occasionally and 50 pounds frequently.  AR 125.  She had no restrictions with bending, stooping or crouching.  AR 125.  Dr. Bhangoo further opined that Plaintiff did not seem to have limitations with reaching, feeling, grasping, and fingering, but might have some difficulty when she has flare-ups.  AR 125.  She did not have any visual, communicative or workplace environmental limitations.  AR 125.  Dr. Bhangoo rated Plaintiff's maximal functional capacity as "heavy without occasional limitations of handling, grasping and fingering during flare-ups."  AR 126.

On December 6, 2004, Darell Sharbaugh, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 127-134.  Dr. Sharbaugh opined that Plaintiff could lift and/or carry 50 pounds occasionally and 25 pounds frequently.  AR 128.  She could stand and/or walk about 6 hours in an 8-hour workday and sit for about 6 hours in an 8-hour workday.  AR 128.  She could push and/or pull without limitation, other than as shown for lift and/or carry.  AR 128.  She did not have postural, manipulative, visual, communicative or environmental limitations.  AR 129-131.

On December 13, 2004, Plaintiff sought treatment from Dr. Watrous.  AR 136.  Plaintiff complained of increased discomfort to her knees.  AR 136.  She reported being turned down for disability because she could stand for over six hours and lift over 50 pounds.  AR 136.  Dr. Watrous opined that Plaintiff was "a frail rheumatoid patient" who did not appear to be able to lift more than 10 pounds.  AR 136.  On examination, Plaintiff had mild synovitis to MCP joints in both hands and swelling to tibial tuberosity of her left knee.  AR 136.  Dr. Watrous assessed Plaintiff with rheumatoid arthritis flare.  AR 136.

On January 12, 2005, Plaintiff sought treatment from Dr. Watrous.  AR 166.  On examination, she had mild tenderness in the wrists, MCPs, and small joints of her hands.  AR 166.

On January 27, 2005, Alfred Torre, M.D., completed a Physical Residual Functional Capacity Assessment form.  AR 140-147.  Dr. Torre opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  AR 141.  She could stand and/or walk about 6 hours in an 8-hour workday and could sit about 6 hours in an 8-hour workday.  AR 141.  She was limited in her upper extremities regarding the operation of hand controls.  AR 141.  She had no postural, manipulative, visual, communicative or environmental restrictions.  AR 142-144.

On February 15, 2005, Plaintiff sought follow-up treatment.  AR 163.  She reported "over all doing fair."  AR 163.  She had increased discomfort since missing Remicade.  AR 163.  On examination, no joint swelling or synovitis was noted.  AR 163.

On February 25, 2005, Dr. Watrous completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) form.  AR 152-154.  Dr. Watrous opined that Plaintiff could lift and/or carry 5-10 pounds occasionally and 2-5 pounds frequently.  AR 152.  She could stand and/or walk a total of 2 hours in an 8-hour day and 1/4 of an hour without interruption.  AR 152.  She could sit for a total of 4 hours in an 8-hour day and 1 hour without interruption.  AR 153.  She never could climb, kneel, crouch or crawl.  AR 153.  She occasionally could stoop and balance.  AR 153.  Dr. Watrous further opined that Plaintiff's reaching, handling, and pushing/pulling were affected by the impairment.  AR 153.  She had environmental restrictions of heights, moving machinery, temperature extremes and vibration.  AR 154.

1    On February 25, 2005, Plaintiff sought treatment from Dr. Watrous. AR 162. Plaintiff

2    reported that she did not think she would be able to support herself with disability and she might

3    be able to go back to work with great difficulty. AR 162. On examination, Plaintiff had mild

4    discomfort in the wrists, knees and small joints of the hands and feet. AR 162. She was to

5    continue with methotrexate at an increased dose. AR 162.

6    On July 21, 2005, Plaintiff sought treatment from Dr. Watrous. AR 161. She reported

7    running out of methotrexate. AR 161. She wanted to resume taking it as she could not afford to

8    go back on Remicade. AR 161. She complained of increasing soreness and aching and

9    requested Elavil and Vicodin. AR 161. On examination, Plaintiff had no significant synovitis.

10   AR 161. Plaintiff was to continue methotrexate and folic acid with Vicodin and Elavil. AR 161.

11   On August 23, 2005, Plaintiff sought follow-up treatment for her rheumatoid arthritis.

12   AR 160. Plaintiff indicated that she had been feeling that her rheumatoid symptoms were not

13   that bothersome, but she noted some increased stiffness and soreness. AR 160. On examination,

14   no joint swelling or active synovitis was noted. AR 160. Plaintiff was to restart methotrexate

15   and continue with folic acid, Vicodin and Elavil as needed. AR 160.

16   On September 23, 2005, Plaintiff sought follow-up treatment. AR 159. She reported

17   discontinuing methotrexate after developing dizziness and insomnia. AR 159. Plaintiff

18   requested "alternative treatment for her rheumatoid symptoms." AR 159. She reported a

19   moderate pain level, but high stress and poor sleep pattern due to stress. AR 159. She was able

20   to most of her activities of daily living with some effort. AR 159. On examination, she had

21   limited range of motion to wrists and hands, but no noted synovitis. AR 159. She was started on

22   Arava. AR 159.

23   On November 9, 2005, Plaintiff saw Dr. Watrous for her rheumatoid arthritis. AR 158.

24   Plaintiff reported that she was not able to tolerate Arava. AR 158. She informed Dr. Watrous

25   that she was starting a business sewing clothes for dancers and "doing quite well." AR 158. On

26   examination, Plaintiff had mild tenderness in the wrist, knees and small joints of the hands and

27   feet. AR 158. Dr. Watrous refilled her prescription for Vicodin. AR 158.

28

On February 28, 2006, Plaintiff sought treatment from Dr. Watrous.  AR 155.  She reported taking Vicodin, folic acid, over-the-counter nonsteroidal anti-inflammatories and evening primrose oil.  AR 155.  On examination, Plaintiff had mild tenderness in the wrists, knees and ankles.  AR 155.

ALJ's Findings

The ALJ determined that Plaintiff met insured status requirements through March 31, 2009.  AR 13.  The ALJ also determined that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision.  AR 13.  The ALJ found that Plaintiff had the severe impairment of rheumatoid arthritis, but she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 13-14.  The ALJ further found that Plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently.  AR 14.  She could stand and walk six hours of an eight-hour workday and sit six hours of an eight-hour workday with a sit/stand option.  AR 14.  She was limited in her upper extremities and should not perform continuous repetitive operative hand controls.  AR 14.  The ALJ concluded that Plaintiff was unable to perform any past relevant work, but considering her age, education, work experience and residual functional capacity, she had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy.  AR 17.  Therefore, the ALJ found that Plaintiff was not under a "disability."  AR 18.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means more than a mere scintilla, *Richardson v. Perales*, 402 U.S. 389, 401 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401

(internal quotation marks and citation omitted).  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards, and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g) (2006).  Applying the evaluation process in this case, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity for the relevant time period; (2) has an impairment or a combination of impairments that is considered "severe" (rheumatoid arthritis) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520, 416.920 (2006)); (3) does not have an impairment or combination of impairments that meets or equals one of the impairments set forth in Appendix 1 to Subpart P of Part 404; (4) is not able to perform her past relevant work; but (5) there are jobs that exist in significant numbers in the national economy that she can perform.  AR 13-18.

1    In this case, Plaintiff argues that the ALJ (1) failed to present all of Plaintiff's

2  impairments to the vocational expert; (2) improperly assessed the physician opinions; and (3)

3  improperly assessed Plaintiff's credibility

4                                    **DISCUSSION**

5  A.    <u>Substantial Evidence</u>

6        1.    <u>Hypothetical Question</u>

7        Plaintiff contends that the ALJ erred by failing to present Plaintiff's limitations in her

8  upper extremities to the vocational expert.  "Hypothetical questions posed to the vocational

9  expert must set out *all* the limitations and restrictions of the particular claimant . . . ."  *Embrey v.*

10 *Bowen*, 849 F.2d 418, 422 (9th Cir.1988).  The testimony of a vocational expert "is valuable only

11 to the extent that it is supported by medical evidence."  *Sample v. Schweiker*, 694 F.2d 639, 644

12 (9th Cir. 1982).  The vocational expert's opinion about a claimant's residual functional capacity

13 has no evidentiary value if the assumptions in the hypothetical are not supported by the record.

14 *Embrey*, 849 F.2d at 422.

15        Here, the ALJ found that Plaintiff "is limited in her upper extremities and should not

16 perform continuous repetitive operative hand controls."  AR 14.  The Commissioner admits that

17 the ALJ's hypothetical question to the vocational expert omitted Plaintiff's restriction from

18 "continuous repetitive operative hand controls," but argues that this narrowly tailored restriction

19 does not materially affect the universe of jobs available at the light level, and the ALJ's failure to

20 present such a restriction is "harmless error."  Respondent's Opposition to Appellant's Opening

21 Brief ("Opposition"), at p. 6.

22        To support this argument, the Commissioner relies on Social Security Ruling ("SSR") 83-

23 14, which provides that "many unskilled light jobs do not entail fine use of the fingers.  Rather,

24 they require gross use of the hands to grasp, hold and turn objects."  SSR 83-14 also provides

25 that "[a]ny limitation of these functional abilities must be considered very carefully to determine

26 its impact on the size of the remaining occupational base of a person who is otherwise found

27 functionally capable of light work."  In this case, the ALJ did not determine that Plaintiff had

28 restrictions in reaching, handling (gross manipulation) or fingering that would require a

1   determination of their impact on the size of the remaining occupational base.  Accordingly, it

2   cannot be said that the omission of Plaintiff's non-exertional limitation regarding continuous

3   repetitive operative hand controls in the hypothetical question was error.

4         Further, the record supports the ALJ's determination that Plaintiff did not have any

5   manipulative restrictions.  During the period from March 2004 through February 2006, objective

6   findings by Dr. Watrous, her treating physician, generally revealed only  "mild discomfort,"

7   "mild swelling," or "mild tenderness" and, on one occasion, "mild synovitis."  AR 99, 102, 104,

8   105, 107, 109, 137, 155, 158, 162, 166.

9         In November 2004, Dr. Bhangoo, a consultative examiner, found that Plaintiff used her

10  hands and upper extremities in a normal fashion.  AR 123.  She had no evidence of redness,

11  tenderness, synovial hypertrophy or joint deformities usually associated with rheumatoid arthritis

12  in her hands.  AR 124.  Her motor strength was 5/5 in all extremities and her hand grip was

13  normal.  AR 125.  Dr. Bhangoo opined that Plaintiff did not seem to have limitations with

14  reaching, feeling, grasping, and fingering, but might have some difficulty when experiencing a

15  flare-up.  AR 125.  Dr. Bhangoo rated Plaintiff's maximal functional capacity as "heavy without

16  occasional limitations of handling, grasping and fingering during flare-ups."  AR 126.  Plaintiff

17  informed Dr. Bhangoo that she was able to do her personal care, help her mother with the

18  household chores and garden.  AR 122.  She painted regularly and occasionally went dancing.

19  AR 123.

20        In December 2004, state agency physician Darell Sharbaugh opined that Plaintiff did not

21  have manipulative limitations.  AR 130.  In January 2005, Dr. Torre, also a state agency

22  physician, opined that Plaintiff did not have any manipulative limitations.  AR 143.

23        Plaintiff herself testified at the hearing in 2006 that she drives, goes dancing, gardens,

24  does household chores and cooks.  AR 186, 187, 193.

25        Insofar as Plaintiff alleges that the VE ignored the limitations by Plaintiff's treating

26  physician as to the abilities to reach, handle, push or pull because they had not been quantified,

27  this allegation is not instructive as the ALJ did not adopt the opinion of Dr. Watrous regarding

28

Plaintiff's functional limitations. As addressed below, the ALJ properly considered, and declined to adopt, the opinion of Dr. Watrous.

2.   Physician Opinions and Assessments

Plaintiff argues that the ALJ improperly rejected the opinion of her treating physician, Dr. Watrous, and that more weight should be given to the opinion of a treating source. It is true that the medical opinion of a claimant's treating physician is entitled to "special weight." *Embrey, 849 F.2d at 421.* Reliance on the opinion of the treating physician is based not only on the fact that he is employed to cure but also on his greater opportunity to observe and know the patient as an individual. However, a treating physician's opinion is not conclusive as to a physical condition or the ultimate issue of disability. *Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992).* An ALJ may reject a contradicted treating physician's opinion on the basis of clear findings that set out specific, legitimate reasons for the rejection. *Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).*

In this case, the ALJ rejected the opinion of Dr. Watrous and, instead, adopted the contradictory opinion of the non-examining state agency physician, Dr. Torre. The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer v. Sullivan, 908 F.2d 502, 506 n. 4 (9th Cir. 1990); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).* In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes, 881 F.2d at 751-55; Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995); Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir.1995).* For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony *alone* to reject the opinions of Magallanes's treating physicians...." *Magallanes, 881 F.2d at 752* (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id. at 751-52.*

1       Here, the ALJ did not rely on the nonexamining physician's opinion alone to reject the

2  opinion of Plaintiff's treating physician.  The opinion of Dr. Watrous also is contradicted by the

3  consultative examiner and reviewing state agency physicians.  After setting out a detailed

4  summary of the contradictory opinions and the medical evidence, the ALJ concluded that the

5  opinion of Dr. Torre was consistent with the overall record, including Plaintiff's own testimony

6  and her daily activities.  AR 14-16.

7       The ALJ expressly rejected the opinion of Plaintiff's treating physician based on

8  objective examination of Plaintiff by Dr. Watrous that revealed only mild discomfort in her wrist,

9  knees, hands and feet.  AR 16.  Plaintiff contends that the record reveals discomfort levels that

10  were noted by Dr. Watrous to be "well above mild."  Plaintiff's Opening Brief, at p. 6.

11  Plaintiff's contention is without merit.  Plaintiff does not point to any evidence demonstrating

12  discomfort levels "well above mild."  The record also bears out the ALJ's assessment of Dr.

13  Watrous' treatment records.  As discussed above, the record reflects that, on multiple

14  examinations occurring between March 2004 and February 2006, Dr. Watrous found Plaintiff

15  only had "mild discomfort," "mild swelling," or "mild tenderness" and, on one occasion, "mild

16  synovitis."  AR 99, 102, 104, 105, 107, 109, 137, 155, 158, 162, 166.

17       Further, Dr. Watrous rendered his opinion regarding Plaintiff's functional capacity in a

18  brief form without a detailed explanation or supportive findings.  The ALJ need not accept an

19  opinion of a treating physician if it is conclusionary and brief and is unsupported by clinical

20  findings.  *Magallanes,* 881 F.2d at 751.  Dr. Watrous cited findings of Plaintiff's "joint pain,"

21  "joint tenderness", "pain," "swelling," "stiffness with sitting" and "loss of strength" to support

22  his determination that Plaintiff had limitations in reaching, handling, pushing/pulling and only

23  could: (1) lift and/or carry 5-10 pounds occasionally, 2-5 pounds frequently; (2) stand and/or

24  walk a total of 2 hours in an 8-hour day and 1/4 of an hour without interruption; (3) sit for a total

25  of 4 hours in an 8-hour day and 1 hour without interruption; and (4) never climb, kneel, crouch or

26  crawl.  AR 152-153.  Dr. Watrous' treatment records, however, revealed clinical findings

27  consisting solely of "mild" discomfort, tenderness or swelling of Plaintiff's hands, wrists or

28  joints.

1    The Court is mindful of the recent decision in *Orn v. Astrue,* 495 F.3d 625 (9th Cir.

2    2007), where the Ninth Circuit reiterated and expounded upon its position regarding the weight

3    afforded to the opinion of a treating physician.  However, where the treating physician's opinion

4    is not supported in the first instance, as here, *Orn v. Astrue* is not instructive.

5    The ALJ also rejected Dr. Watrous' opinion because he did not upgrade Plaintiff to a

6    stronger medication during her treatment.  AR 16.  Plaintiff argues that the record reveals

7    numerous medication upgrades.  Plaintiff's Opening Brief, at p. 7-8.  Plaintiff correctly notes that

8    Dr. Watrous prescribed increasing amounts of Remicade and methotrexate.  AR 99, 100, 102,

9    105-106, 107.  However, the record also demonstrates that while Plaintiff could no longer afford

10   Remicade and began exploring alternative remedies, she reported on one treatment visit that her

11   symptoms were not that bothersome, objective evidence showed that she did not have any

12   increasing tenderness and she reported a moderate pain level on only one occasion.  AR 155,

13   158, 159, 160.

14       3.    Credibility

15   Plaintiff contends that the ALJ did not properly evaluate Plaintiff's credibility.  The ALJ

16   is required to make specific findings assessing the credibility of Plaintiff's subjective complaints.

17   *Ceguerra v. Sec'y of Health & Human Serv.,* 933 F.2d 735, 738 (9th Cir. 1991).  As noted above,

18   in rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible

19   and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834

20   (9th Cir. 1995).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as

21   to the severity of her pain and impairments is unreliable, the ALJ must make a credibility

22   determination with findings sufficiently specific to permit the court to conclude that the ALJ did

23   not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir.

24   2002).

25   "The ALJ may consider at least the following factors when weighing the claimant's

26   credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

27   testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

28   record, and testimony from physicians and third parties concerning the nature, severity, and effect

1  of the symptoms of which [claimant] complains." *Id.* at 958-959 (citing *Light v. Soc. Sec.*
2  *Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by
3  substantial evidence in the record, we may not engage in second-guessing." *Id.* at 959.

4         Here, the ALJ made specific findings in assessing Plaintiff's credibility. First, the ALJ
5  considered Plaintiff's activities of daily living. The ALJ noted that Plaintiff takes care of her
6  personal hygiene, cooks, does housekeeping and occasionally ballroom dances. AR 15. The
7  record supports the ALJ's determination regarding Plaintiff's daily activities. In 2004, Plaintiff
8  reported to Dr. Bhangoo that she could do her personal care, help with household chores, garden,
9  paint regularly and occasionally go dancing. AR 122-123. In 2006, Plaintiff herself testified that
10  she drives a SUV, is able to garden, occasionally goes ballroom dancing, does housework and
11  cooks. AR 187, 188, 193. An ALJ may consider a claimant's daily activities when weighing
12  credibility. *Thomas*, 278 F.3d at 959.

13        Second, the ALJ discounted Plaintiff's credibility based on MRI imaging of her right and
14  left metacarpophalangeal joint. AR 15-16. The ALJ indicated that the MRI did not reveal
15  erosions that would cause disabling pain. AR 16. The lack of medical evidence, along with
16  other factors, may support an ALJ's rejection of pain testimony. *See*, *e.g.,* *Tidwell v. Apfel,* 161
17  F.3d 599,602 (9th Cir. 1998).

18        Third, the ALJ found Plaintiff's allegations less than credible based on her testimony that
19  she has taken the same dosage of pain medication for four years, which shows that her pain has
20  not increased and her condition has not worsened. AR 16. Although Plaintiff testified that she
21  does not take a "real high dose" of Vicodin for pain (AR 189), Plaintiff correctly notes that there
22  is no testimony in the record regarding her dosage remaining unchanged over a four year period.
23  The ALJ's determination regarding the duration of pain medication is not supported by the
24  record.

25        Fourth, the ALJ rejected Plaintiff's testimony based on inconsistencies about her abilities
26  between her testimony and a written statement. AR 16. Specifically, the ALJ noted that Plaintiff
27  testified that she can sit or stand for six hours and lift 10 to 20 pounds sometimes, but wrote that
28  she can stand and sit for half an hour to one hour a day. AR 16. The ALJ also relied on

Plaintiff's testimony that she can work at least six hours a day as long as she takes her pain

medication.  AR 16.  Plaintiff argues that there is no basis in fact for the contention that she

could sit or stand for six hours and that the activity level suggested by the ALJ would leave her a

"vegetable" due to the levels of pain medication that would be required.  Plaintiff generally

testified that she could lift 10 pounds, could lift 20 pounds occasionally and could work six hours

a day provided she took pain medication.  AR 188-189, 206.  In contrast, she provided a

statement in September 2004 that indicated she could stand ½ hour to 1 hour at a time and could

sit ½ hour to 1 hour at a time.  AR 57.  An ALJ properly may consider inconsistencies in a

claimant's testimony when assessing credibility.  *Thomas*, 278 F.3d at 958-959.

       Finally, the ALJ discounted Plaintiff's credibility based on the routine or conservative

nature of her treatment.  AR 16.  Plaintiff counters that routine or conservative care is all that is

available due to her lack of medical insurance or ability to pay for aggressive treatment.  While

an ALJ is permitted to consider lack of medical treatment in assessing credibility, "[d]isability

benefits may not be denied because of the claimant's failure to obtain treatment [s]he cannot

obtain for lack of funds." *Orn,* 495 F.3d 625 (9th Cir. 2007) (citing *Gamble v. Chater*, 68 F.3d

319, 321 (9th Cir.1995)).  The record reflects that in 2005 and in 2006, Plaintiff had not been able

to afford her medications, stopped Remicade infusions due to insurance difficulties and could not

afford to go back on Remicade.  AR 155, 161, 166.  In February 2006, her treating physician

noted efforts to obtain "assistance to begin Humira injections."  AR 155.  There is no indication

in the record whether such injections were provided or attempted and the record does not entirely

support the ALJ's determination regarding the nature of Plaintiff's treatment because of her lack

of insurance.  However, the records do indicate that after stopping Remicade and/or

methotrexate, Dr. Watrous continued to note that Plaintiff only had "mild tenderness" or "mild

discomfort."  AR 155, 158, 162.

       Despite any error on the part of the ALJ regarding the duration of her pain medication and

the her treatment while lacking insurance, the ALJ has provided other specific, cogent reasons for

rejecting Plaintiff's subjective complaints of pain.  *Batson v. Barnhart*, 359 F.3d 1190, 1197 (9th

1 Cir. 2004) (ALJ's credibility determination may be upheld even though one reason may have

2 been in error).

3                                        **RECOMMENDATION**

4          Based on the foregoing, the Court finds that the ALJ's decision is supported by

5 substantial evidence in the record as a whole and is based on proper legal standards.

6 Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision

7 of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for

8 Defendant Michael J. Astrue and against Plaintiff Linda Jones.

9          These findings and recommendations will be submitted to the Honorable Lawrence J.

10 O'Neill pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) days after

11 being served with these findings and recommendations, the parties may file written objections

12 with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

13 and Recommendations."  The parties are advised that failure to file objections within the

14 specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d

15 1153 (9th Cir. 1991).

16

17    ___IT IS SO ORDERED._____

18    **Dated:**    **May 5, 2008**                    **/s/ Gary S. Austin**
      _____
19                                              UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28